# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

MARC CHRISTOPHER TURNER,
    *Defendant-Appellant.*

No. 11-10038

D.C. No.
2:00-cr-00547-
GEB-GGH-1

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
March 14, 2012—Berkeley, California

Filed August 7, 2012

Before: John T. Noonan, M. Margaret McKeown, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge McKeown;
Dissent by Judge M. Smith

8879

## COUNSEL

Benjamin David Galloway, Federal Public Defender's Office, Sacramento, California, for defendant-appellant Marc Christopher Turner.

Richard A. Friedman (argued), United States Department of Justice, Criminal Division, Washington, D.C., for plaintiff-appellee the United States.

Camil A. Skipper, United States Office of the U.S. Attorney, Sacramento, California, for plaintiff-appellee the United States.

## OPINION

McKEOWN, Circuit Judge:

The Adam Walsh Child Protection and Safety Act (the "Adam Walsh Act" or the "Act") sets up a process for civil commitment of "sexually dangerous persons." This appeal raises the question of whether a civil detention under the Act constitutes a term of imprisonment that both precludes and tolls the commencement of a supervised release term of a sex offender who has completed his incarceration for a criminal conviction.

Following the expiration of his criminal sentence, Marc Christopher Turner was detained under the Adam Walsh Act's stay-of-release provision, which automatically stays

release until completion of protective procedures under the Act. 18 U.S.C. § 4248(a). Under normal circumstances, Turner's term of supervised release would have commenced upon release from imprisonment. In any event, the supervised release term is tolled only "during any period in which the person is imprisoned in connection with a conviction . . . ." 18 U.S.C. § 3624(e). Though Turner received no hearing during the entire four and a half year stay period and was detained only pursuant to a *civil* statute, the government would have us hold that Turner was imprisoned in connection with a *criminal* conviction, thus tolling the commencement of his term of supervised release. Resolution of this question requires us to consider the interplay among three different statutory schemes: 18 U.S.C. § 4248 (the stay-of-release provision of the Adam Walsh Act); 18 U.S.C. § 3624(a) (the definition of term of imprisonment); and 18 U.S.C. § 3624(e) (the supervised release statute).[1] We conclude that detention pending the outcome of a civil commitment hearing pursuant to § 4248 does not constitute "imprisonment," and that Turner's term of supervised release was not tolled during his civil detention. The government and the dissent each offer a different construction of the intersection of the statutes, underscoring why, at a minimum, the rule of lenity also tips in Turner's favor.

## BACKGROUND

Turner pleaded guilty to two counts of distributing visual depictions of minors engaged in sexually explicit conduct in violation of § 2252(a)(2). He was sentenced to 46 months in prison and a 36-month term of supervised release. Turner was incarcerated in the Federal Correctional Institution in Butner, North Carolina ("FCI Butner"). Upon completion of his prison sentence, Turner was released.

---

[1]Unless otherwise indicated, all subsequent statutory citations are to Title 18 of the United States Code.

Three years later, Turner admitted that he had violated conditions of his supervised release, and on June 29, 2007, the district court sentenced him to eight months in prison and a 22-month term of supervised release. Turner again served his prison sentence at FCI Butner. Due to good time credits, his prison sentence expired on September 7, 2007.

Prison records confirm Turner's good time credit release at noon on September 7, 2007. Two minutes later, he was admitted for "Adam Walsh Act Review." On that same day, the government filed a "Certification of a Sexually Dangerous Person" against Turner in the United States District Court for the Eastern District of North Carolina. *See* 18 U.S.C. § 4248(a). Turner received an assignment of "A-Pre WA," meaning that he was being detained pursuant to the Walsh Act's stay-of-release provision. *See* 18 U.S.C. § 4248(a). Turner remained in civil detention for over four years at FCI Butner pending his civil commitment hearing, which was not held until February 2012. At no point after noon on September 7, 2007, was Turner in custody pursuant to a criminal sentence.

On May 17, 2010, while in detention, Turner filed a motion to terminate his term of supervised release on the ground that the term had run during his civil detention under § 4248. The district court denied the motion.

Almost five years after the expiration of Turner's prison sentence, on February 27, 2012, the district court in North Carolina held a bench trial to determine whether Turner should be civilly committed. On March 9, 2012, the court entered judgment in favor of Turner, finding that the government failed to prove by clear and convincing evidence that, as a result of a serious mental illness, abnormality or disorder, Turner would have serious difficulty refraining from sexually violent conduct or child molestation if released. The court ordered the United States to release Turner. *United States v. Turner*, No. 5:07-HC-2167-D-JG, 2012 WL 965985, at *2 (E.D.N.C. March 9, 2012).

ANALYSIS

## I.  STATUTORY BACKGROUND

"The starting point in interpreting a statute is its language, for if the intent of Congress is clear, that is the end of the matter." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993) (internal quotation marks and other marks omitted). We thus begin our de novo review with the relevant statutes. *See United States v. Cabaccang*, 332 F.3d 622, 624-25 (9th Cir. 2003) (en banc).

### A.   18 U.S.C. §§ 4247 & 4248—THE ADAM WALSH ACT

**[1]** Congress enacted the Adam Walsh Act in 2006. Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, §§ 1-707, 120 Stat. 587, 587-650 (2006). Title III of the Act, codified at §§ 4247-48, establishes a procedure for civil commitment of "sexually dangerous persons" who either are in the custody of the Bureau of Prisons, have been determined mentally incompetent to stand trial and committed to the custody of the Attorney General, or have had criminal charges dismissed on the basis of a mental illness. § 4248(a). The civil commitment provisions "authorize[ ] the Department of Justice to detain a mentally ill, sexually dangerous federal prisoner beyond the date the prisoner would otherwise be released." *United States v. Comstock*, 130 S. Ct. 1949, 1954 (2010).

To initiate civil commitment proceedings, the government must file a petition in the federal district court for the district in which the individual is confined. § 4248(a). The petition, which may be filed by the Attorney General, the Director of the Bureau of Prisons, or a designee of either official, must include a certification that the individual to be committed qualifies as a "sexually dangerous person." *Id.*; *see also United States v. Shields*, 649 F.3d 78, 81 (1st Cir. 2011). A person is considered to be a "sexually dangerous person"

within the meaning of the Act if that individual has previously "engaged or attempted to engage in sexually violent conduct or child molestation" and "is sexually dangerous to others," defined as someone who (1) "suffers from a serious mental illness, abnormality, or disorder" and (2) "as a result of" that mental illness, abnormality, or disorder "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." § 4247(a)(5)-(6). "When [a Certification of a Sexually Dangerous Person] is filed, the statute automatically stays the individual's release from prison, thereby giving the Government an opportunity to prove its claims at a hearing through psychiatric (or other) evidence." *Comstock*, 130 S. Ct. at 1954 (citations omitted). The relevant section, entitled "Civil commitment of a sexually dangerous person," provides in pertinent part: "A certificate filed under this subsection shall stay the release of the person pending completion of procedures contained in this section." § 4248(a). Although the Adam Walsh Act alters the normal procedures for the release of a prisoner, § 4248(a) contains no reference to a prisoner's term of imprisonment. The Act simply authorizes detention beyond the ordinary release date.

## B.   18 U.S.C. § 3624(a) — TERM OF IMPRISONMENT

**[2]** Pursuant to § 3624(a), "[a] prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment . . . ." This language dovetails with § 3621(a), which provides that "[a] person who has been sentenced to a term of imprisonment . . . shall be committed to the custody of the Bureau of Prisons *until the expiration of the term imposed* . . . ." (emphasis added). As used in § 3624(a), "term of imprisonment" refers to the sentence imposed by the sentencing judge. *See Barber v. Thomas*, 130 S. Ct. 2499, 2506 (2010). Under normal circumstances, a prisoner is released from the Bureau of Prisons' custody "on the date of the expiration of the prisoner's *term of imprisonment*, less any time credited . . . ." § 3624(a) (emphasis added).

### C.   18 U.S.C. § 3624(e) — SUPERVISED RELEASE

In imposing a term of imprisonment for a felony or misdemeanor, a court "may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment . . . ." § 3583(a). "A prisoner whose sentence includes a term of supervised release after imprisonment shall be released by the Bureau of Prisons to the supervision of a probation officer who shall, during the term imposed, supervise the person released to the degree warranted by the conditions specified by the sentencing court." § 3624(e). A term of supervised release "commences on the day the person is *released from imprisonment*." *Id.* (emphasis added). However, the commencement of supervised release is subject to the tolling provisions of the statute.

Tolling of a term of supervised release is also governed by § 3624(e), which provides in relevant part: "A term of supervised release does not run during any period in which the person is *imprisoned in connection with a conviction* for a Federal, State, or local crime unless the imprisonment is for a period of less than 30 consecutive days." *Id.* (emphasis added). As we explained in *United States v. Morales-Alejo*, "[a] plain reading of this language suggests that there must be an imprisonment resulting from or otherwise triggered by a criminal conviction." 193 F.3d 1102, 1105 (9th Cir. 1999); *see also United States v. Garcia-Rodriguez*, 640 F.3d 129, 133 (5th Cir. 2011) ("any other term of imprisonment must be 'in connection with a [separate] conviction' for a 'crime' if such imprisonment is to toll the term of supervised release" (alteration in original)).

### II.   CIVIL DETENTION UNDER THE ADAM WALSH ACT DOES NOT TOLL SUPERVISED RELEASE

**[3]** The issue in this appeal, although one of first impression, is a narrow one. The chronology of events is telling as to Turner's status and how his situation fits within the statu-

tory schemes. There is no dispute that prior to 12:00 p.m. on September 7, 2007, Turner was "imprisoned in connection with a conviction," and that his term of supervised release was tolled during this period of imprisonment. *See* § 3624(e). Further the government states that civil commitment under the Act is not imprisonment and, therefore, does not operate to toll a term of supervised release. Had Turner been civilly committed, his supervised release term would have proceeded to run, according to the government's logic. However, because the government did not meet its burden to show that Turner was a "sexually dangerous person," he was never civilly committed under the Act. Thus, the dispute focuses solely on whether Turner's term of supervised release was tolled during the interim period between the end of his imprisonment "in connection with a conviction" on September 7, 2007, and the positive resolution of his civil commitment hearing on February 27, 2012.

**[4]** We conclude that, during the almost five years Turner was kept in limbo awaiting his civil commitment hearing, he was not "imprisoned in connection with a conviction for a . . . crime," which is required to toll the commencement of supervised release under § 3624(e). *See Morales-Alejo*, 193 F.3d at 1104-05. The dissent's mantra that "[w]hat never begins cannot end" simply begs the question. Dissent at 8898. Here, the commencement of supervised release and the stay were virtually simultaneous. And under the facts, Turner completed his imprisonment but his release was stayed. The dissent acknowledges that the outcome it supports "does not seem fair." Dissent at 8900. We agree. We also acknowledge that it may seem odd to conclude that Turner's supervised release could run while civilly detained, but the government concedes as much under at least one scenario and the statutes support our reading.

The government's position on tolling is instructive. According to the government's brief,

> Civil commitment is not imprisonment, therefore Section 4248 civil commitment does not toll supervised release; during the period of civil commitment (*i.e.*, once the defendant is released from imprisonment), supervised release does run. A different analysis applies, however, if the defendant's release is stayed pending resolution of his civil commitment hearing.

The government acknowledges that a civil commitment under the Act does not toll the start of supervised release. Under this approach, had the system expeditiously provided Turner a hearing and then ordered civil commitment, his supervised release would have run during the commitment period. But the government now takes the anomalous posture that during the almost five years it took to determine that Turner *should not be civilly committed*, his supervised release term was, in effect, stayed.

[5] Neither the statutory text nor common sense supports this bifurcated approach. The statute makes no distinction between pre- and post-civil commitment hearing detainees. The stay-of-release provision relates to *all* of the procedures and proceedings in a comprehensive civil commitment statute. The provision states, "A certificate filed under this subsection shall stay the release of the person pending completion of *procedures contained in this section*." 18 U.S.C. § 4248(a) (emphasis added). Notably, the "procedures" referenced by the stay provision are not limited to the ultimate determination that further commitment is warranted. Instead, the civil commitment procedures commence with the government's initial certification but continue through the civil commitment hearing and, for a committed individual, are not completed until a court determines by a preponderance of evidence that the individual is no longer a "sexually dangerous person" and may be discharged. *See* § 4248(a), (c), (e).

A review of the procedural steps illustrates how the stay provision takes effect throughout § 4248 and does not dis-

solve after the commitment hearing. The path between issuance of the certification and release is paved with multiple procedural and substantive determinations. Following filing of the certification, the section states that "[t]he court shall order a hearing to determine whether the person is a sexually dangerous person." § 4248(a). The hearing is governed by the procedures set out in § 4247(d). *See* § 4248(c). The next benchmark is whether "the court finds by clear and convincing evidence that the person is a sexually dangerous person." § 4248(d). If not, then the person is released, as was the case with Turner. If the finding is made, the individual is released to a state for "custody, care, and treatment," or if a state does not accept responsibility, then the Attorney General places the person in a suitable facility. *Id.* Ultimately, if the director of the facility where the individual is placed determines that the individual will not be sexually dangerous to others if released, then there may be another hearing "to determine whether he should be released." § 4248(e). Each of these steps is part of the referenced "procedures."

**[6]** The stay of release equally applies to persons awaiting an initial commitment hearing as to persons committed and hoping for a positive discharge hearing. The false dichotomy offered by the government belies textual and practical sense. Preliminary to civil commitment, the defendant is held only because of the Adam Walsh Act—a civil statute. The tolling effect on a supervised release term should be no different. The only common sense interpretation of § 4248(a) is that the Adam Walsh Act precludes the *release* of a person deemed "sexually dangerous" *into society* until a court has ultimately resolved that he is not or is no longer a danger to others. Had Congress intended the stay-of-release provision to include only persons awaiting a hearing, the reading the government advances, it would have said "pending the first commitment hearing" instead of making the stay applicable to all of the "procedures" in § 4248.[2]

---

[2]An alternate reading would also ignore the broad reach of the statute. Subsection (a) applies to "a person who is in the custody of the Bureau

Apart from the plain meaning of the statute, a contrary interpretation of § 4248 would also contradict the express language of § 3624(e). "Section 3624(e) focuses our analysis on the words 'imprisonment' and 'imprisoned' to describe the type of confinement that controls commencement and tolling of supervised release time." *United States v. Sullivan*, 504 F.3d 969, 971 (9th Cir. 2007). The plain language of the statute "suggests that there must be an imprisonment resulting from or otherwise triggered by a criminal conviction." *Morales-Alejo*, 193 F.3d at 1105. In this regard, the civil nature of Turner's detention is determinative. *See Comstock*, 130 S. Ct. at 1954 (characterizing § 4248 as a "civil-commitment statute"); *cf. Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) ("an individual detained under civil process— like an individual accused but not convicted of a crime— cannot be subjected to conditions that 'amount to punishment.' " (quoting *Bell v. Wolfish*, 441 U.S. 520, 536 (1979))). Turner's continued confinement was not the result of any criminal sentence imposed by a court and exceeded, by many years, what would have been permissible at the time he was sentenced. *See* § 3583(e)(3) (stating that a defendant whose term of supervised release is revoked "may not be required to serve on any such revocation more than . . . 2 years in prison if such offense is a class C or D felony . . . .").

The Supreme Court's decision in *United States v. Johnson*, 529 U.S. 53 (2000), does not resolve the issue we now face—

of Prisons, or who has been committed to the custody of the Attorney General pursuant to section 4241(d), or against whom all criminal charges have been dismissed solely for reasons relating to the mental condition of the person." § 4248(a). All of these individuals are subject to the subsection's stay-of-release provision even though they cannot all be classified as serving a "term of imprisonment." In fact, individuals "against whom all criminal charges have been dismissed solely for reasons relating to the mental condition of the person" have not been convicted of a crime. *Id.* The broad applicability of the statute belies the argument that Congress intended the stay-of-release provision to extend a "term of imprisonment" and somehow toll the commencement of supervised release.

whether supervised release may be tolled when an individual is detained *only* in a civil capacity. *Johnson* dealt with a defendant who, at all times during his incarceration, was "imprisoned in connection with a conviction for a . . . crime." *See id.* at 54-55. Johnson initially received a prison sentence of 171 months' imprisonment, consisting of three concurrent 51-month sentences for his convictions for possession with intent to distribute and felon possession of a firearm, to be followed by two consecutive 60-month terms for his convictions for use of a firearm in connection with a drug trafficking crime. *Id.* Later, Johnson's convictions for use of a firearm in connection with a drug trafficking crime were vacated and the district judge modified his sentence to 51 months. *Id.* at 55. Because Johnson had already served more than 51 months by the time the convictions were vacated, he argued that he was entitled to a reduction in his term of supervised release because "the excess prison time should be credited to the supervised release term, reducing its length." *Id.* at 54.

The Court in *Johnson* rejected this argument, holding that § 3624(e) "does not reduce the length of a supervised release term by reason of excess time served in prison" because it "directs that a supervised release term does not commence until an individual 'is released from imprisonment.' " *Id.* at 60, 57. Although there is language in *Johnson* suggesting that supervised release can never begin when an individual remains in the custody of the Bureau of Prisons, this language must be read against the backdrop of the facts of that case. *See id.* at 57 ("Supervised release does not run while an individual remains in the custody of the Bureau of Prisons."); *id.* ("the ordinary, commonsense meaning of release is to be freed from confinement"). Unlike Turner, Johnson had not yet completed his prison sentence. Rather, during the entire duration of Johnson's incarceration, he was "imprisoned in connection with a conviction" for a crime. *See* § 3624(e). Johnson remained in the custody of the Bureau of Prisons solely because of a criminal sentence.

**[7]** That is not the case with Turner. *Johnson* does not address the situation in which a person who has completed a prison sentence is then placed in *civil* detention, even if the civil detention happens to be overseen by the Bureau of Prisons. As demonstrated by the Bureau of Prisons' inmate history log, Turner was released from criminal custody at noon on September 7, 2007. Upon release from criminal custody, Turner received a completely different inmate classification—a civil detainee classification based on his Walsh Act detention. Notably, the government agrees that "[Turner's] post-sentence detention does not constitute any part of his criminal sentence." Thus, any detention following the expiration of Turner's criminal sentence was civil in nature. "Civil status means civil status . . . ." *Jones*, 393 F.3d at 933. By definition, civil status does not mean "imprisoned in connection with a conviction."[3]

**[8]** In determining whether a particular detention constitutes "imprisonment" for the purposes of § 3624(e), our cases have made it clear that custody of the Bureau of Prisons does not determine whether someone is imprisoned; instead, we

---

[3]As a policy consideration, the dissent focuses on the goals of supervised release and concludes that post-sentence civil detention does not toll a supervised release term. However, the government had every opportunity to ensure Turner received treatment and rehabilitative services during the four and a half years it delayed in providing him with a civil commitment hearing. FCI Butner, where Turner has been continuously held, "operates the [Bureau of Prisons'] Commitment and Treatment Program, which holds certified, post-sentence persons and civilly committed sex offenders who are transferred to Butner for treatment." U.S. DEP'T OF JUSTICE, FEDERAL BUREAU OF PRISONS, STATE OF THE BUREAU 2009, at 30, *available at* http://www.bop.gov/news/PDFs/sob09.pdf. Any failure to provide Turner with the appropriate treatment lays at the feet of the government and is hardly a basis to convert a *civil* statute into one that extends a prisoner's *criminal* term of imprisonment. The realities of confinement—Turner was at FCI Butner pending potential commitment and might well have been placed there had he been committed—underscores why the government's position is internally inconsistent. In either case, Turner would not be serving a criminal sentence.

have focused on the nature of the custody. In *Morales-Alejo*, we clarified that pretrial detention does not constitute "imprisonment" within the meaning of § 3624(e) and thus does not operate to toll a term of supervised release. 193 F.3d at 1106. Like Turner, a pretrial detainee is in the custody of the Bureau of Prisons, but is not "imprisoned in connection with a conviction."[4] Later, in *Sullivan*, we reaffirmed our holding in *Morales-Alejo*, concluding that detention at a community treatment center not subject to Bureau of Prisons control does not toll supervised release. 504 F.3d at 970. *But see United States v. Miller*, 547 F.3d 1207, 1208 (9th Cir. 2008) (distinguishing *Sullivan* by clarifying that detention at a work release program tolls supervised release when the detention *is part of* the term of imprisonment). Detention pursuant to § 4248 pending a civil commitment hearing after a defendant's term of imprisonment has expired does not fit the definition of a person "imprisoned in connection with a conviction." *Johnson* does not command a different analysis, as the entirety of the custody at issue in that case was criminal in nature.

To hold otherwise and consider § 4248's "stay-of-release" provision as extending Turner's term of imprisonment raises serious constitutional questions. *See Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon

---

[4]Under the dissent's reading, all custody is equivalent, whether it is civil or criminal. This analysis fails to take account that "imprisoned" and "in custody" are not equivalent. For example, the Bureau of Prisons considers individuals committed under § 4241(d)—who are also subject to the Walsh Act stay-of-release provision—to be pretrial inmates. *See* U.S. DEP'T OF JUSTICE, FEDERAL BUREAU OF PRISONS, PROGRAM STATEMENT 7331.04, § 551.101(a)(2) (Jan. 31, 2003) ("An inmate committed under Title 18 U.S.C. Sections 4241(b) and (d) . . . is considered to be a pretrial inmate . . . ."); *see also id.* § 551.101(a) ("For purposes of this rule, 'pretrial inmate' means a person who is legally detained but for whom the Bureau of Prisons has not received notification of conviction.").

that score." (internal quotation marks omitted)). Section 4248 requires no hearing prior to the government's certification—on its belief—that a prisoner is a "sexually dangerous person" and provides no time limit in which a civil commitment hearing must be held after a certification has been issued. If this pre-commitment detention, which requires no judicial determination and minimal procedural safeguards, constitutes imprisonment, then the constitutionality of the Act is open to question. *See Stogner v. California*, 539 U.S. 607, 612 (2003) (including among ex post facto laws "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed" (quoting *Calder v. Bull*, 3 U.S. 386, 390 (1798))); *Foucha v. Louisiana*, 504 U.S. 71, 86 (1992) (holding that "the State must establish insanity and dangerousness by clear and convincing evidence in order to confine an insane convict beyond his criminal sentence, when the basis for his original confinement no longer exists"); *Hill v. United States ex rel. Wampler*, 298 U.S. 460, 464 (1936) ("The only sentence known to the law is the sentence of judgement entered upon the records of the court."). In essence, though the district court imposed a term of imprisonment of eight months and could not have imposed a term longer than two years, adopting the government's position would mean that an extension of Turner's term of imprisonment by four and a half years beyond that imposed by the district court is within the bounds of congressional authority in passing a *civil* confinement statute. Congress certainly did not express any intention to reach such a result.

**[9]** Finally, the rule of lenity cuts in Turner's favor. We recognize that the rule does not generally apply to a civil statute. However, the stay provision of the Act directly implicates Turner's supervised release, which is part and parcel of his criminal sentence. Implementation of the civil statute requires, in the case of a prisoner whose sentence includes supervised release, interpretation and application of the criminal statutes. The intertwining of the Act with the criminal provisions at issue is sufficient to invoke the rule of lenity. *Cf.*

*Leslie Salt Co. v. United States*, 55 F.3d 1388, 1398 (9th Cir. 1995) ("The rule of lenity has not been limited to criminal statutes, particularly when the civil sanctions in question are punitive in character." (citing *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 518 n.10 (1992))); *Sash v. Zenk*, 439 F.3d 61, 63-64 (2d Cir. 2006) (noting that statutes may be "criminal" for some purposes but not for others). To the extent that this constellation of statutes "fail[s] to establish that the Government's position is *unambiguously correct—we . . .* resolve the ambiguity in [Turner's] favor." *Cabaccang*, 332 F.3d at 635 (quotation marks omitted). After considering the text, structure, history and purpose of the statute, we are left with "a grievous ambiguity or uncertainty in the statute." *Barber*, 130 S. Ct. at 2508-09 (internal quotation marks omitted).

**[10]** The ambiguity in the statute is particularly highlighted when contrasting the two separate interpretations offered by the government and the dissent. The dissent claims that supervised released never commenced so there is nothing to stay while the government claims the stay kicks in upon certification but is somehow lifted once commitment is ordered. Both of these approaches cannot be correct nor can they be squared with our interpretation which endeavors to reconcile all three of the relevant statutes. *See id.* (recognizing that "the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." (internal quotation marks and citation omitted). In passing the Adam Walsh Act, Congress apparently did not affirmatively consider the effect of § 3624(e), the supervised release statute. In the same vein, Congress made no effort to amend that provision. Rewriting the statute is beyond our province; to the extent Congress intended to treat the limbo period between expiration of a sentence and imposition of a civil commitment as a "sexually dangerous person" as tolling supervised release, the fix is a legislative one.

For the above reasons, Turner's detention under § 4248 after his sentence expired does not amount to imprisonment "in connection with a conviction" within the meaning of § 3624(e). Accordingly, Turner's term of supervised release was not tolled while he remained in custody after his sentence expired, and his term of supervised release ended on July 7, 2009.

**REVERSED**.

---

M. SMITH, Circuit Judge, dissenting:

The majority holds that supervised release may begin and end before a person is released from prison. Because the Supreme Court has squarely held otherwise, and the majority's conclusion defies both common sense and the reasoning of binding precedent, I respectfully dissent. *See United States v. Johnson*, 529 U.S. 53, 57 (2000) ("Supervised release *does not run while an individual remains in the custody* of the Bureau of Prisons.") (emphasis added).

As an initial matter, the majority misconstrues the issue here. The question is not, as the majority contends, whether a term of supervised release was tolled. The issue is whether a term of supervised release *began* when an individual was not free to leave a prison. I would hold that binding authority dictates that supervised release cannot begin until one is physically released from prison.

The commencement and tolling provisions of 18 U.S.C. § 3624(e) are distinct. They "work in different ways" and contain different statutory requirements. *See* 18 U.S.C. § 3624(e); *Tobey v. United States*, 794 F. Supp. 2d 594, 600 (D. Md. 2011). Unlike the tolling provision, the commencement provision does *not* contain any requirement that imprisonment be "in connection with a conviction." *Compare id.*

("The term of supervised release commences on the day the person is released from imprisonment . . . ."), *with id.* ("A term of supervised release does not run during any period in which the person is imprisoned in connection with a conviction for a Federal, State, or local crime unless the imprisonment is for a period of less than 30 consecutive days."). Thus, under the commencement provision, a person's term of supervised release cannot begin until he or she is allowed physically to leave a prison. *See id.* What never begins cannot end. Whether the physical confinement is imposed pursuant to a sentence or otherwise in connection with a conviction is irrelevant; the purpose of and reasons for the prisoner's confinement do not matter. *Id.* It is the fact of physical confinement that controls. *See id.* This critical difference between § 3624(e)'s tolling and commencement provisions eludes the majority. The majority simply ignores § 3624(e)'s clear command in the commencement provision that a term of supervised release can neither begin nor end while an individual physically remains in the Bureau of Prisons's custody. *See Johnson*, 529 U.S. at 57.

According to the majority, Defendant-Appellant Marc Christopher Turner's (Turner) term of supervised release ran while he was still physically in prison. No evidence suggests that he was free to leave, or that he physically left the premises of the prison. Rather than releasing Turner, Plaintiff-Appellee United States of America (the Government) filed a "Certification of a Sexually Dangerous Person" under 18 U.S.C. § 4248(a) the day Turner's sentence was set to expire. The filing of this certification automatically and indefinitely stayed Turner's release from prison. *See* 18 U.S.C. § 4248(a) ("A certificate filed under this subsection shall stay the release of the person pending completion of procedures contained in this section."); *United States v. Comstock*, 130 S. Ct. 1949, 1954 (2010) ("When such a certification is filed, the statute automatically stays the individual's release from prison, thereby giving the Government an opportunity to prove its claims at a hearing through psychiatric (or other)

evidence.") (internal citations omitted). Therefore, even though Turner completed his sentence, he was not allowed to leave prison. At all relevant times, he remained in the custody of the Bureau of Prisons (BOP).

In *Johnson*, the Supreme Court interpreted 18 U.S.C. § 3624(e), the statute controlling when a term of supervised release begins. *See Johnson*, 529 U.S. at 57. Under § 3624(e), a "term of supervised release commences on the day the person is released from imprisonment . . . ." 18 U.S.C. § 3624(e). In construing the meaning of "released from imprisonment," the Supreme Court clarified that the question is not whether a person's sentence ends, but whether a person is physically released from confinement. *See Johnson*, 529 U.S. at 57 (defining "release" in the context of imprisonment as "mean[-ing] '[t]o loosen or destroy the force of; to remove the obligation or effect of; hence to alleviate or remove; . . . [t]o let loose again; to set free from restraint, confinement, or servitude; to set at liberty; to let go.' "). Because "the ordinary, commonsense meaning of release is to be freed from confinement," a person may not be released while still imprisoned. *Id.* Further emphasizing that physical freedom from confinement is required for a person's term of supervised release to begin, the Supreme Court explained that supervised release does not begin while a person remains in the BOP's custody. *See id.* The Court also explained that other language in § 3624(e) supported its construction, such as the phrase "on the day the person is released" in the second sentence of § 3624(e) "suggest[ing] a strict temporal interpretation, not some fictitious or constructive earlier time." *Id.* Accordingly, a person's term of supervised release does not commence, as a matter of law, once a person completes his lawful term of imprisonment. *See id.* at 58.

Under *Johnson*, Turner's term of supervised release could not have begun while he was awaiting a civil commitment hearing because he was not physically freed from confinement. *See id.* at 57. To say that Turner was "released" for pur-

poses of his supervised release beginning while he physically remained in prison "diminishes the concept the word ['release'] intends to convey." *Id.* It also treats the completion of a sentence and release from imprisonment as interchangeable, despite the Supreme Court's admonition that we not do so. *See id.* at 58-59.

It is true that the Supreme Court in *Johnson* interpreted § 3624(e) before the Adam Walsh Child Protection and Safety Act of 2006 (Adam Walsh Act), Pub. L. No. 109-248, 120 Stat. 587 became law. The Adam Walsh Act is the genesis of the current version of 18 U.S.C. § 4248(a), which automatically stays an individual's release from prison when the Government certifies to a federal district judge that a prisoner has engaged in sexually violent activity or child molestation in the past, and that he suffers from a mental illness making him dangerous to others. *See Comstock*, 130 S. Ct. at 1954. A prisoner may not be released until a hearing at which the Government has an opportunity to prove its claims. *See id.* Thus, the Adam Walsh Act requires an individual to remain physically confined in prison despite completing his or her sentence.

Working in tandem, the Adam Walsh Act and the Supreme Court's interpretation of § 3624(e) in *Johnson* produce an admittedly disquieting result: a person's term of imprisonment may end without him or her being freed from confinement, thereby preventing the commencement of a term of supervised release. I agree that this result, at first glance, does not seem fair. It arguably raises serious constitutional concerns, as the majority argues, and could not have been foreseen when the Supreme Court decided *Johnson*. Nevertheless, it is not within our authority to rewrite the law, as interpreted by the Supreme Court, as we see fit, however laudable our policy concerns. The Supreme Court upheld Congress's power under the Constitution to enact the Adam Walsh Act in *Comstock*, and has never revised its construction of § 3624(e) in *Johnson*. *See id.* at 1965; *Johnson*, 529 U.S. at 57. Until the Supreme Court alters its construction of § 3624(e) so as to

allow a person's term of supervised release to begin while he or she physically remains in prison, *Johnson* remains binding authority. *See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983) ("Needless to say, only this Court may overrule one of its precedents."); *United States v. Qualls*, 172 F.3d 1136, 1138 (9th Cir. 1999) (en banc) (recognizing the Supreme Court's interpretation of the federal felon-in-possession statute as binding); *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996), *vacated*, 522 U.S. 3 (1997) (stating that a Supreme Court decision should be overruled, but following it, and noting that "the Supreme Court has told the lower federal courts, in increasingly emphatic, even strident, terms, not to anticipate an overruling of a decision by the Court; we are to leave the overruling to the Court itself.").

The majority's attempts to distinguish *Johnson* fail. The fact that the Supreme Court was presented with different facts in *Johnson* is simply irrelevant. *Johnson* interpreted a statute; the Supreme Court never stated or implied that its interpretation of § 3624(e) would be different under another set of facts, or that it was limited to the peculiar facts arising in that case. *See Johnson*, 529 U.S. at 57 (stating without qualification that "the ordinary, commonsense meaning of release is to be freed from confinement" and "[s]upervised release does not run while an individual remains in the custody of the Bureau of Prisons"). Moreover, the Supreme Court has "held that the meaning of words in a statute cannot change with the statute's application." *United States v. Santos*, 553 U.S. 507, 522 (2008) (plurality opinion). "To hold otherwise 'would render every statute a chameleon,' and 'would establish within our jurisprudence . . . the dangerous principle that judges can give the same statutory text different meanings in different cases.' " *Id.* at 522-23 (citation omitted). Thus, the majority's attempt to limit the Supreme Court's construction of § 3624(e) to "the backdrop of the facts of [*Johnson*]" does precisely what the Supreme Court has admonished courts not to do: give statutory text different meanings in different cases, thus establishing a useful tool for lower courts to evade the

Supreme Court's binding interpretations of statutes. *See id.* We should not take this step the Supreme Court has clearly enjoined. *See id.*

The majority also misreads *Johnson*. Contrary to the majority's interpretation, the Supreme Court was quite clear that a term of supervised release may not begin while a person physically remains in prison. *See id.* (defining the meaning of "release" in the context of imprisonment as requiring freedom from confinement). As the Supreme Court noted, "To say respondent was released while still imprisoned diminishes the concept the word intends to convey." *Id.* Yet the majority holds that Turner was "released" for the purpose of determining the commencement of his term of supervised release even though he remained in prison. Thus, the majority adopts an interpretation of a statute that the Supreme Court has expressly rejected.

*United States v. Morales-Alejo*, 193 F.3d 1102 (9th Cir. 1999) does not help Turner or the majority. In *Morales-Alejo*, we considered whether pretrial detention operated to toll a term of supervised release under the tolling provision in 18 U.S.C. § 3624(e), which provides for tolling "during any period in which the person is imprisoned *in connection with a conviction* . . . unless the imprisonment is for a period of less than 30 consecutive days." *Id.* at 1103 (emphasis added). The present case, in contrast, concerns the *commencement provision*, a *separate* provision in § 3624(e) controlling when a term of supervised release commences, *not* whether it is tolled. *See* 18 U.S.C. § 3624(e) ("The term of supervised release commences on the day the person is released from imprisonment . . . ."). Of critical importance, the separate provision at issue in this case does *not* require that imprisonment be "in connection with a conviction." *See id.* Under the plain language of § 3624(e), any imprisonment, regardless of whether it is imposed in connection with a conviction, prevents supervised release from beginning. *See id.* Thus, the holding in *Morales-Alejo* is wholly divorced from the issue in

this case. *See Tobey*, 794 F. Supp. 2d at 600-01 (explaining in further detail why *Morales-Alejo* does not address the issue in this case and noting that "[b]ecause the Ninth Circuit's decision concerns the *tolling* effect of a period of confinement, rather than the effect of confinement on the *commencement* of supervised release, the case is inapposite"). Even if *Morales-Alejo* were relevant to the commencement of a supervised release term, it predates *Johnson* and has been overruled to the extent it is inconsistent with *Johnson*.[1] *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Thus, *Johnson* remains controlling law in this case.[2]

---

[1]It is also worth noting that every other circuit that has reached the same issue has rejected *Morales-Alejo*. *See, e.g.*, *United States v. Ide*, 624 F.3d 666, 668-69 (4th Cir. 2010) (listing circuits that have rejected *Morales-Alejo* and joining the Fifth, Sixth, and Eleventh Circuits in holding "that a defendant's term of supervised release is tolled while the defendant is held in pretrial detention on charges for which he is later convicted").

[2]*United States v. Sullivan*, 504 F.3d 969 (9th Cir. 2007) is not to the contrary. In that case, the critical question was whether a person's detention at a Montana community pre-release center tolled his term of supervised release. *See* 504 F.3d at 970. *Sullivan* is also distinguishable because in that case the detention occurred at a pre-release center with different features from imprisonment, whereas in this case the Government filed a certificate "stay[ing] the release of the person" from the Bureau of Prisons's custody, thereby prolonging his confinement in prison. *See* 18 U.S.C. § 4248(a); *Sullivan*, 504 F.3d at 972. Furthermore, in *Sullivan*, the court noted that pre-release centers in Montana were intended to be a rehabilitative alternative to imprisonment and that the defendant was "not subject to the control of the Bureau of Prisons." *See Sullivan*, 504 F.3d at 971-72. In contrast, the purpose of prolonging a person's confinement under § 4248(a) is "to protect the public from federal prisoners who suffer from 'a serious mental illness, abnormality, or disorder' and who, if released, would have 'serious difficulty in refraining from sexually violent conduct or child molestation.' " *Comstock*, 130 S. Ct. at 1969 (Alito, J., concurring); *see also Comstock*, 130 S. Ct. at 1974 (Thomas, J., dissenting); *United States v. Timms*, 664 F.3d 436, 449 (4th Cir. 2012). Thus, the goals of the Adam Walsh Act are much more similar to the purposes of imprisonment than to the rehabilitative goals of pre-release centers. *See* 18 U.S.C. § 4248(a).

For good reason, an overwhelming majority of courts presented with the issue in this case have held that a term of supervised release may not begin while a person remains in prison awaiting a civil commitment hearing under the Adam Walsh Act. See, e.g., *United States v. Revland*, No. 02-CR-4025-DEO-1, 2011 WL 6780868, at \*1-2 (N.D. Iowa Dec. 27, 2011); *Tobey*, 794 F. Supp. 2d at 601; *United States v. Francis*, No. 03-166-KSF, 2011 WL 1642571, at \*3 (E.D. Ky. May 2, 2011); *United States v. Combe*, No. 1:04-CR-51 TS, 2011 WL 976892, at \*2 (D. Utah Mar. 18, 2011); *United States v. Bolander*, No. 01-CR-2864-L, 2010 WL 5342202, at \*2-3 (S.D. Cal. Dec. 21, 2010); *United States v. Wilkinson*, No. 1:CR-93-158, 2010 WL 598609, at \*5 (M.D. Pa. Feb. 17, 2010). *But see United States v. Brown*, No. 3:04-cr-00119 JWS, 2011 WL 1831627, at \*4 (D. Alaska May 12, 2011). The fact that the majority here adopts a position almost unanimously rejected by federal courts that have reached the issue reflects the shortcomings of the majority's reasoning and conclusion. If the past is any guide to the future, it seems likely that most circuit courts, and perhaps our own court, sitting en banc, will also reject the majority's position when presented with the issue in this case.

The majority also errs by ascribing any significance to my disagreement with the Government's contention that supervised release runs during a period of civil commitment. "A stipulation of law is not binding upon an appellate court," and "[w]e are not bound by a party's erroneous view of the law." *Avila v. INS*, 731 F.2d 616, 620 (9th Cir. 1984) (citations omitted). There is "no reason why we should make . . . an erroneous decision, because the applicable law was not insisted upon by one of the parties." *Id.* at 621 (citation omitted). Lawyers are advocates for their clients' interests, not arbiters of a statute's meaning. Thus, the fact that the Government misstated the law in its answering brief is irrelevant. It should not hinder our task of giving democratically-enacted "texts their fair meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 3 (2012).

Moreover, as the Supreme Court unanimously held, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). There is simply no basis for considering the difference between a dissent and a party's interpretation as evidence that a statute is ambiguous.

The majority's rule of lenity analysis fares no better. It misstates both the role played by the rule of lenity in a court's interpretation of a statute and the circumstances in which the rule of lenity may even be considered. According to the majority, "the rule of lenity cuts in Turner's favor" because I construe § 3624(e) differently from the Government. This is an erroneous statement of law. "Lenity cannot be invoked merely because a different reading of the statute is possible." *United States v. Pearson*, 321 F.3d 790, 791 (9th Cir. 2003). Contrary to the majority opinion's contentions, the rule of lenity does not apply whenever a court is not convinced that the Government's position is unambiguously correct. The Supreme Court recently repudiated this very argument, explaining that "the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute,' such that the Court must simply 'guess as to what Congress intended[.]' " *Barber v. Thomas*, 130 S. Ct. 2499, 2508-09 (2010) (citations omitted). The rule of lenity may remain inapplicable even where a court is not "perfectly certain that [it] ha[s] divined Congress' intentions as to [a] particular situation." *Beecham v. United States*, 511 U.S. 368, 374 (1994). The majority fails to overcome the fact that the Supreme Court defined the meaning of § 3624(e) in *Johnson*. Because the meaning of the statute is clear, and Supreme Court precedent squarely controls, there is no ambiguity and the rule of lenity does not apply here. *See Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 262 (1994) (stating that "the rule of lenity applies only when an ambiguity is present"); *United*

*States v. Gonzalez*, 407 F.3d 118, 124 (2d Cir. 2005) ("[T]he rule of lenity is not a catch-all maxim that resolves all disputes in the defendant's favor—a sort of [judicial] 'tie goes to the runner.' ").

The policy consequences of the majority opinion are troubling. The majority's conclusion defeats the purpose of supervised release. The Supreme Court explained: "Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends, *distinct from those served by incarceration*." *Johnson*, 529 U.S. at 59 (emphasis added). To find that Turner's term of supervised release expired while he physically remained in prison removes a source of assistance he might have received in living a productive life outside of prison. This result does him no favors. It may even increase his risk of recidivism. *See United States v. Hanrahan*, 508 F.3d 962, 971 (10th Cir. 2007) ("It is well-established that the purpose of supervised release is to provide enough supervision to prevent recidivism on the part of the offender."); Marcus T. Boccaccini, Daniel C. Murrie, Jennifer D. Caperton & Samuel W. Hawes, *Field Validity of the Static-99 and MNSOST-R Among Sex Offenders Evaluated for Civil Commitment as Sexually Violent Predators*, 15 Psychol. Pub. Pol'y & L. 278, 307 (2009) (discussing "findings suggest[ing] that mandatory supervision may be an effective mechanism for reducing reoffending"). Thus, the majority's conclusion may have the effect of denying supervised release services precisely when they are most needed: when an individual adjusts to life outside of prison.

Lastly, the majority overlooks the heightened importance of stare decisis in cases involving statutory interpretation. Even if *Johnson* was wrongly decided and it were our prerogative to overrule it, stare decisis strongly favors maintaining the Supreme Court's interpretation of 18 U.S.C. § 3624(e) in *Johnson*. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977 ) ("[C]onsiderations of stare decisis weigh heavily in

the area of statutory construction, where Congress is free to change this Court's interpretation of its legislation."); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 899 (2007) (stating that "[s]tare decisis reflects a policy judgment that in most matters it is more important that the applicable rule of law be settled than that it be settled right" and "concerns about maintaining settled law are strong when the question is one of statutory interpretation") (citations omitted). Once the Supreme Court has construed a statute, "stability is the rule," and the Court will not depart from it absent a compelling justification. *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 280 (2009) (Souter, J., dissenting). Yet the majority not only lacks a good reason for departing from *Johnson*, it attempts, sub silentio, to usurp the Supreme Court's prerogative to overrule its own cases.

In sum, the majority errs by treating the completion of a sentence and release from imprisonment for supervised release purposes as interchangeable. The Supreme Court could not have been more clear in rejecting this view. *See Johnson*, 529 U.S. at 58-59 ("All concede respondent's term of imprisonment should have ended earlier than it did. *It does not follow, however, that the term of supervised release commenced, as a matter of law, once he completed serving his lawful sentences*. It is true the prison term and the release term are related, for the latter cannot begin until the former expires. *Though interrelated, the terms are not interchangeable*.") (emphasis added). Therefore, I would follow *Johnson* and hold that Turner's term of supervised release could not begin while he physically remained in prison.

I respectfully dissent.